

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 0 1 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ROSEANNA M. GARZA | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. B-02-210 |
| SAM'S CLUB A/K/A WAL-MART STORES | § | |
| INC. AND HILL FLORAL PRODUCTS | § | |
| INC. | § | |

### DEFENDANT SAM'S EAST, INC. D/B/A SAM'S CLUB'S RESPONSE TO DEFENDANT HILL FLORAL PRODUCTS, INC.'S FIRST MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR SUMMARY JUDGMENT

**TO THE HONORABLE JUDGE OF SAID COURT:**

**SAM'S EAST, INC. d/b/a SAM'S CLUB** (hereinafter designated as "Sam's Club"), a co-defendant in the above-captioned cause, responds to Defendant Hill Floral Products, Inc.'s (hereinafter designated as "Hill Floral") First Motion for Judgment as a Matter of Law or for Summary Judgment, and would show the Court as Follows:

**I.**

### INTRODUCTION AND SUMMARY OF ARGUMENT

While Sam's Club has denied Plaintiff's allegations of injury as alleged in Plaintiff's Second Amended Petition, Sam's Club has further asserted that plaintiff's alleged injuries, if any, were proximately caused, or contributorily caused, by the actions of co-defendant Hill Floral. Defendant Hill Floral submits no independent evidence or affidavits to support its Motions. A review of Defendant Hill's legal arguments, while admittedly innovative, contains fatal flaws which cannot support its Motions.

## II.

### EVIDENCE IN SUPPORT OF RESPONSE

Defendant Sam's Club relies on the pleadings herein filed and the deposition testimony of Benedicta Martinez, Hill Floral employee. See condensed transcript of the deposition of Benedicta Martinez taken on September 18, 2003 as Exhibit "A".

## II.

### ARGUMENT

Defendant Floral Hills asserts that because Sam's Club had control over its premises, the issue is one of premises liability, and Floral Hills cannot be held liable under a theory of premises liability. Sam's Club does not disagree with this assertion. However, Floral Hills goes on to argue that because plaintiff's alleged injuries were not caused by its "negligent activity" concurrent with such negligence, Floral Hills cannot be found liable under a theory of negligence either. This is simply not the case. Defendant Hill Floral, while advancing an admirably imaginative argument, is simply mixing apples with oranges.

It is true that a premises liability claim against an owner/operator must be *either* a premises defect case or a negligent activity case. **Clayton W. Williams, Jr. v. Olivio**, 952 S.W.2d 523, 527 (Tex. 1997). <u>However, this only applies to the claim against Sam's Club.</u> This distinction has caused a great deal of confusion. For example in **Wal-Mart Stores, Inc., v. Garza, 27 S.W.3d 64 (Tex. App. - San Antonio 2000)**, the plaintiff in the underlying case ran into problems on appeal because the case was submitted to the jury under a premises defect instruction. In fact, the plaintiff's injuries occurred when a Wal-Mart employee dropped a heavy box on the head of the Plaintiff. Thus, because the injury occurred as the concurrent result of a negligent activity of an employee, the court found

that a submission against Wal-Mart properly should have taken the form of a *respondeat superior* submission, due to the negligent act of its employee. The reason for distinguishing the two types of jury submission is simple. Although the premises owner/operator ultimately can be held liable under either theory, under different sets of facts, each of the two submissions require different elements of proof and have different affirmative defenses.

This does not alleviate a third-party from potential liability for his or her own acts of negligence. Defendant Hill Floral cites two cases in support of its argument. First, **Keetch v. The Kroger Company, 845 S.W.2d 363 (Tex. 1992).** This case dealt with the alleged negligent activity of an employee of Kroger, a half-hour prior to the injury. The main issue on appeal was whether the act of the employee concurrently caused the injury, thus requiring a negligent activity submission, or the employee's act was not concurrent with the injury, thus requiring a premises defect submission. There were no third-parties involved.

The second case cited by Defendant Hill Floral, **Timberwalk Apartments v. Cain, 972 S.W.2d 749 (Tex. 1998),** did involve a third-party. However, this was a case where a tenant of an apartment complex was raped by an intruder. The civil suit was brought against the apartment complex and management company, and the issue was the forseeability of such criminal activity. The rapist was not a party to the case.

The Texas Supreme Court has held that "one who creates a dangerous condition may be liable for breach of a duty of care even though not in control of the premises at the time of the injury." **Strakos v. Gehring, 360 S.W.2d 787, 790 (Tex. 1962).** Accord **Leftmark Management Co. v. Old, 946 S.W.2d 52, 54 (Tex. 1997)** (" one who creates

a dangerous condition owes a duty of due care."); *City of Denton v. Page,* 701 S.W.2d 831, 834 (Tex. 1986).

Citing the *Strakos case,* the Appellate Court in **Crown Derrick Erectors, Inc. v. Dew, 117 S.W.3d 526 (Tex. App. - Beaumont 2003)**, states as follows at 530:

> "The fact that one who assumes control over a dangerous condition left by a contractor may be liable for injuries resulting therefrom does not necessarily mean that he who creates the danger should escape liability." *Id.* Liability for creating the danger in the first place is grounded in the public policy of negligence law, that a person is responsible for an injury which is the foreseeable consequence of the person's own negligent act or omission.

## IV.

## CONCLUSION

The ultimate issue of whether the acts of an agent or employee of Hill Floral was negligent in creating a dangerous condition, and whether that dangerous condition caused or contributed to cause plaintiff's alleged injuries is a issue that properly should be decided by the jury.

Wherefore, for all of the above-cited reasons, Defendant Sam's East, Inc. d/b/a Sam's Club contends that Defendant Hill Floral's Motion for Summary Judgment as a Matter of Law or for Summary Judgment should be denied in all respects.

Respectfully submitted,

DRABEK & ASSOCIATES

_____
Jaime A. Drabek
SBOT: 06102410
Federal ID No. 8643
1720 E. Harrison St., Suite B
Harlingen, Texas 78550
(956) 428-4544
(956) 428-4880 (FAX)

## **CERTIFICATE OF SERVICE**

    I do hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record by certified mail, return receipt requested and/or hand delivery on this \_\_\_\_\_30th\_\_\_\_\_ day of June, 2004.

Michael Fisher
Roerig, Olivera & Fisher, L.L.P.
855 W. Price Rod, Suite 9
Brownsville, Texsas 78520

Mr. Frank Costilla
Law Offices of Frank Costilla, L.L.P.
5 East Elizabeth Street
Brownsville, Texas 78520

_____
Jaime A. Drabek

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ROSEANNA M. GARZA,     )(
    Plaintiff     )(
        )(
VS.     )(    CIVIL ACTION NO. B-02-210
        )(
SAM'S CLUB a/k/a WAL-MART )(
STORES, INC.,     )(
    Defendant     )(

ORAL AND VIDEOTAPED DEPOSITION OF
BENEDICTA MARTINEZ
SEPTEMBER 18, 2003

ORAL AND VIDEOTAPED DEPOSITION OF BENEDICTA MARTINEZ, produced as a witness at the instance of the PLAINTIFF, taken in the above styled and numbered cause on SEPTEMBER 18, 2003, reported by CORINNA N. GARCIA, Certified Court Reporter No. 5210, in and for the State of Texas, at the offices of Roerig, Oliveira & Fisher, L.L.P., 855 West Price Road, Suite 9, Brownsville, Texas, pursuant to the Federal Rules of Civil Procedure.

RECEIVED
OCT - 3 2003
JAIME DRABEK

Page 2

APPEARANCES

COUNSEL FOR PLAINTIFF:

    ALEJANDRO GARCIA
    LAW OFFICE OF FRANK COSTILLA
    5 East Elizabeth Street
    Brownsville, Texas 78520

COUNSEL FOR DEFENDANT SAM'S CLUB A/K/A
WAL-MART STORES, INC.:

    JAIME DRABEK
    JAIME DRABEK & ASSOCIATES
    1720 East Harrison, Suite B
    Harlingen, Texas 78550

COUNSEL FOR DEFENDANT HILL FLORAL PRODUCTS, INC.:

    W. MICHAEL FISHER
    ROERIG, OLIVEIRA & FISHER, L.L.P.
    855 West Price Road, Suite 9
    Brownsville, Texas 78520

ALSO PRESENT:
    Rene Ortiz, Videographer

Page 3

INDEX

                                PAGE

Appearances . . . . . . . . . . . . . . . . . . . . . . . . 2

BENEDICTA MARTINEZ

Examination by Mr. Garcia . . . . . . . . . . . . . 4

Examination by Mr. Drabek . . . . . . . . . . . . 30

Examination by Mr. Garcia . . . . . . . . . . . . 33

Errata Sheet/Signature Page . . . . . . . . . . . . 35

Reporter's Certificate . . . . . . . . . . . . . . . . 36

Attached to the end of the transcript: Stipulations

EXHIBITS
                                PAGE
NUMBER    DESCRIPTION                MARKED

   1     Diagram . . . . . . . . . . . . . . . . . . . . . . . 16

Page 4

1          BENEDICTA MARTINEZ,
2 having been duly sworn, testified as follows:
3           EXAMINATION
4 BY MR. GARCIA:
5   Q. Please state your name for the record, your full
6 name.
7   A. Benedicta Martinez.
8   Q. Okay. Do you have a nickname?
9   A. Yes, Beni Martinez.
10   Q. Okay. Ms. Martinez, my name is Alejandro
11 Garcia. I'm a lawyer representing a plaintiff by the
12 name of Roseanna Garza, and she has brought a lawsuit
13 against Sam's Club, Wal-Mart, and against Hill Floral
14 Products, Inc., and I'm going to ask you a few questions
15 today about what you know or may not know about an
16 incident involving Mrs. Garza back in March of last
17 year, an incident that took place at the Sam's Club.
18 Can I have -- can I have your address, please?
19   A. 24360 FM 1599, Harlingen, Texas.
20   Q. Okay.
21   A. 78551, ZIP code.
22   Q. Are you married?
23   A. No, single.
24   Q. Okay. Do you have any children?
25   A. No.

Page 5

1   Q. May I have your phone number there in Harlingen?
2   A. 428-1488.
3   Q. Okay. Have -- how long have you lived at that
4 Harlingen address?
5   A. Approximately about 18 to 20 years.
6   Q. Okay. And where were you living before that?
7   A. In Mexico.
8   Q. Okay. Is that where you were born?
9   A. Yes.
10   Q. All right. Where in Mexico?
11   A. San Luis Potosi.
12   Q. Okay. Have you ever had your deposition taken
13 before? Have you ever been in a setting like this?
14   A. No.
15   Q. All right. Well, I'll go over a couple of the
16 ground rules. I'm just here to ask you some questions
17 based on what you know and not on what you don't know.
18 So if you don't know the answer to my question, please
19 say so. If you don't understand my question, please ask
20 me to rephrase it or restate it so it will be clear and
21 so you can understand.
22        Because we have a court reporter here,
23 she's going to be taking everything down that we say,
24 and it's hard for her to take down a nod of the head or
25 if you say "uh-huh" or "huh-uh," she won't know what

Page 6

1 that means. So please try to say your answers "yes" or
2 "no," or whatever they may be so she can understand.
3     I will ask my questions, and, if you would,
4 wait until I finish my question before you start your
5 answer, and I will try to do the same. I'll try to make
6 sure you finish your answer before I ask the next
7 question.
8     Ms. Martinez, who is your employer?
9  A. Hill Floral.
10 Q. Okay. How long have you been employed with
11 them?
12 A. Since March of 2002.
13 Q. Okay. Where were you working before that?
14 A. In a flower shop in Harlingen.
15 Q. Okay. What was that flower shop?
16 A. Kay's Bokay.
17 Q. How did it come about that you got the job with
18 Hill Floral? Did you see an ad or something that you
19 applied for?
20 A. Actually, there was a friend of mine that
21 referred me to this job.
22 Q. Okay. Was that friend of yours an employee of
23 Hill --
24 A. He was.
25 Q. -- as well?

Page 7

1  A. Yes.
2  Q. Okay. What is his name?
3  A. Gary Briceno.
4  Q. Gary Priseno?
5  A. Uh-huh.
6  Q. P-R-E-S-E-N-O, maybe?
7  A. Briceno.
8  Q. Oh, with a B?
9  A. B, Bri, Briceno.
10 Q. Briceno, okay. Is he still working for Hill?
11 A. No.
12 Q. Did you meet with somebody -- who was the person
13 with Hill that hired you?
14 A. District supervisor.
15 Q. Where is Hill's main offices located?
16 A. Richmond, Indiana.
17 Q. Was the district supervisor that hired you --
18 did you have to go up there to Indiana, or was he down
19 here?
20 A. She was down here.
21 Q. She? Okay. What's her name?
22 A. I'm not sure of her last name, but her first
23 name is Mary.
24 Q. Mary?
25 A. Uh-huh.

Page 8

1  Q. As far as you know, she's still the district
2 supervisor?
3  A. No.
4  Q. As far as you know, she's still working with
5 them?
6  A. No.
7  Q. Working with Hill?
8  A. I'm not sure.
9  Q. Okay. Who is your immediate supervisor?
10 A. Lucy Carmona.
11 Q. And is Lucy down here in Brownsville, or where
12 does Lucy have her office?
13 A. San Antonio.
14 Q. Okay. What's her title, if you know?
15 A. District supervisor.
16 Q. She's the district supervisor?
17 A. Yes.
18 Q. Okay. Presently you work for Hill Floral.
19 Where do you work?
20 A. At Sam's.
21 Q. Okay. Is it the Sam's on Alton Gloor in
22 Brownsville?
23 A. On Alton Gloor, yes.
24 Q. Okay. Since you've been with Hill, have you
25 always been working at that Sam's?

Page 9

1  A. Yes.
2  Q. Okay. What is your title there?
3  A. Department manager.
4  Q. And I understand that to be the floral
5 department?
6  A. Yes.
7  Q. Okay. Does anybody else work there at Sam's
8 with you that's also an employee of Hill's?
9  A. Yes.
10 Q. Okay. Who would that be? What other employees
11 that work for Hill work at the Sam's where you work?
12 A. There is another person employed there.
13 Q. Okay. What is that person's name?
14 A. Josefina Rubiano.
15 Q. Josefina Rubiano?
16 A. Rubiano, yes.
17 Q. Okay. Are you his supervisor?
18 A. Yes.
19 Q. All right. How long has he been working there?
20 A. She's been -- I'm not sure.
21 Q. She? I'm sorry.
22 A. Yes, she's a she. I don't remember exactly the
23 date.
24 Q. Okay. Has she been working there as long as you
25 have?

Page 10

1   A. No.
2   Q. When you get paid, do you get paid by Hill, by
3 your employer, or do you receive a check from Sam's?
4   A. By Hill
5   Q. Okay Do you know what type of arrangement
6 Sam's/Wal-Mart has with Hill?
7   A. No, I don't.
8   Q. Okay. Does Hill do -- are they in other Sam's
9 facilities around the state? Do you know?
10   A. I'm not aware exactly, but they have other
11 places in other stores.
12   Q. Okay As the department manager, what do you do
13 there at the Sam's, at the Sam's store? What are your
14 duties? What are your job duties there at Sam's?
15   A. Okay. I'm responsible basically for everything
16 that is happening in the department, for sales,
17 marketing, and providing good service for members and
18 also make sure that the department looks basically fully
19 stocked every time -- I mean, every day.
20   Q. You use the word "members." Is that a customer?
21   A. Yes.
22   Q. Is that about the same thing as a customer?
23   A. Yes, correct.
24   Q Okay How about Ms. Rubiano, what are her
25 duties?

Page 11

1   A. She is also basically about the same thing that
2 I do when I'm not there.
3   Q. Okay. Are you a full-time employee?
4   A Yes
5   Q And is Ms. Rubiano as well?
6   A. Part-time.
7   Q. Part-time?
8   A. Yes.
9   Q. Floral department, obviously, sells flowers?
10   A. Correct.
11   Q. How do you all get those flowers? Are they
12 shipped in from somewhere, or how are they delivered to
13 the store?
14   A. They're shipped to the store.
15   Q. Okay. Big 18-wheeler truck comes or something?
16   A. Yes.
17   Q With a lot of flowers in it?
18   A. Yes.
19   Q. Okay. Are you aware that a shipment will be
20 coming in --
21   A. Yes
22   Q. -- before it comes in?
23   A Yes
24   Q Whose responsibility is it to unload the truck?
25   A. Receiving department.

Page 12

1   Q. Okay. Is the receiving department part of
2 Hill's or is it part of Sam's?
3   A. Sam's.
4   Q. So Sam's employees make up the receiving
5 department?
6   A. Yes.
7   Q Okay. And it's their job to unload the truck?
8   A. Correct.
9   Q. Okay. After they've unloaded it, what happens
10 next? All the flowers are now off the truck. I take it
11 somewhere in --
12   A. They take it to the floral department, and then
13 from there I --
14   Q. Okay. They -- they're responsible for moving
15 everything to the floral department?
16   A. Yes.
17   Q. Okay. The procedure that you've just described
18 where the truck comes in, it's unloaded by receiving,
19 and everything is delivered to your department, is that
20 the procedure that's always been in place since March of
21 last year or since you started?
22   A. Correct.
23   Q. All right. Do you have any responsibility for
24 doing any unloading yourself?
25   A. No, I don't.

Page 13

1   Q. Are the flowers brought in on pallets, or how
2 are they brought in? Are they --
3   A. Sometimes in pallets.
4   Q Are they just loose?
5   A. No, sometimes in pallets or sometimes they use
6 the forklift.
7   Q. Okay. They use the forklift to lift up the
8 pallets?
9   A. Yes.
10   Q. All right. When they don't use a forklift, is
11 there another means of moving the pallets around?
12   A. Yes, a regular pallet jack.
13   Q. Okay. Are you responsible for ever using the
14 forklift or the pallet jacks?
15   A. Only the pallet jack.
16   Q. Okay. Are you required to move your own
17 flowers, or do you reply on Sam's employees to do that
18 for you?
19   A. No, I don't rely. I am responsible for that,
20 but they're very helpful. They help me to carry my
21 product over. Or when they see that I need help, they
22 help me.
23   Q. Okay. So you're responsible for moving the
24 flowers. Once they've been offloaded, you're
25 responsible for moving them to your department, but

Page 14

1 sometimes you get help from Sam's employees; is that
2 right?
3   A. Correct.
4   Q. Okay. When you first started at Sam's, did
5 anybody explain to you whose job it was to unload and
6 whose job it was to move them from here to the
7 department? I mean, did you all have a meeting or
8 something to discuss the way that was going to take
9 place?
10   A. It was explained to me.
11   Q. Okay. Who would have explained that to you?
12   A. My district manager.
13   Q. Okay. And at that time her name was Mary?
14   A. Mary.
15   Q. Mary. We don't know her last name. I'm going
16 to now ask you what you might know about this accident,
17 okay? As I told you, I represent a lady named Roseanna
18 Garza. She contends that she slipped on some water at
19 the Sam's Club, or some sort of liquid that was on the
20 floor, back on March 8th of last year. Were you working
21 at Sam's on March 8th of last year?
22   A. Yes.
23   Q. Okay. You told me that you had just started
24 working in March. So I guess you hadn't been there very
25 long; is that correct?

Page 15

1   A. Correct.
2   Q. Okay. Do you know what your first day was or
3 when you first started?
4   A. I'm not sure on the date, and I don't remember
5 exactly the date, but it was -- it was not the 3rd. It
6 was the 4th. But it was one of those days.
7   Q. Okay. Do you recall there being some sort of
8 grand opening celebration or anything like that?
9   A. Yes.
10   Q. Was the store pretty crowded?
11   A. Yes, it was pretty -- pretty crowded. It was a
12 lot of people.
13   Q. Okay. Have you ever met Ms. Roseanna Garza? Do
14 you recall meeting her?
15   A Yes
16   Q. Okay. Do you recall being there the day that
17 she fell?
18   A. Yes.
19   Q. Did you see her fall?
20   A. No.
21   Q. Are you aware of any Sam's employees or anybody
22 that did actually see her fall?
23   A. No.
24   Q  Did you see her immediately after she fell?
25   A. I guess you could say not immediately, but I saw

Page 16

1 her when she was on the floor.
2   Q. Okay. Did you see her from a distance, or did
3 you walk over there, or how did you happen to come up on
4 her?
5   A. I was walking towards that area.
6   Q. And she was on the floor. Was anybody else --
7 were there any Sam's employees around her?
8   A. I don't recall exactly, but, yes, I think there
9 was -- there was another employee there already.
10   Q. Okay. And would you know who that employee was?
11   A. I believe his name is Jose Francisco.
12   Q. Did you say anything to Mrs. Garza?
13   A. Yes. I said, "Are you okay? Let me help you."
14   Q. Okay. How were you going to try to help her?
15   A. By picking her up.
16   Q. Okay  And what was her response to you?
17   A. "No, I'm okay. I'm just all wet."
18   Q. All right. Are you aware of anything that
19 Mr. Martinez told her?
20   A. No.
21   Q. Okay. I'm going to show you what I'm going to
22 have marked as Exhibit No. 1. And this is a plan or
23 blueprint of the area where we believe the accident took
24 place. I'd like you to take a look at it real quick and
25 see if you're familiar with the layout that I'm showing

Page 17

1 you in that plan.
2   A. Okay. A little bit.
3   Q. Does that look like the layout of the Sam's
4 store where you work at?
5   A. Kind of looks similar.
6   Q. All right. Is your department shown on the area
7 where you work at? Is your department shown there?
8 Maybe to the far left?
9   A. Yes.
10   Q. Okay. I'd like you to take this pen and mark a
11 circle around your department area.
12   A. All right.
13   Q. Okay. Is your department limited to that area?
14 I mean, are you in any other parts of the store that are
15 not shown here on this plan? I mean the floral
16 department.
17   A. Any other -- can you repeat that question again?
18   Q. Yeah, and I apologize. Did the floral
19 department have any other areas in the store where you
20 take care of your business that are not shown on this
21 plan?
22   A. Yes.
23   Q. And I apologize, because, you know, this is just
24 a small part of the whole store.
25   A. Yes.

Page 18

1 Q. It's a very big store.
2 A. No, it's okay.
3 Q. What other areas?
4 A. I keep part of my flowers in the produce cooler.
5 Q Okay. And where is that located?
6 A. It's --
7 Q. Is it shown on the plan?
8 A. No, I don't see it.
9 Q. Okay.
10 A. No.
11 Q. Is it -- in relation to the layout of the store,
12 is it towards the back of the store?
13 A. Correct.
14 Q. Okay. Who moves the flowers from the delivery
15 truck to the produce cooler? Who is responsible for
16 that? Is that the receiving guys?
17 A. Correct.
18 Q. Okay. And then your responsibilities are to
19 move them from the produce cooler to your area?
20 A. Correct.
21 Q. All right. Do you remember -- from looking at
22 this map, do you know where Ms. Garza fell?
23 A. I want --
24 Q. Do you recall?
25 A. I want to say it was in this aisle right here.

Page 19

1 I'm not sure, though. But I think it was the last
2 aisle.
3 Q. Okay. Will you put a little X right there where
4 you believe she fell? If you're not sure, you don't
5 have to mark it.
6 A. I'm not -- I don't think I'd be -- I'm not sure
7 exactly where.
8 Q. Okay. When you approached her and you saw her,
9 she was on the ground, you said, right? She was already
10 on the ground?
11 A. She was already on the floor.
12 Q. Was there some -- did you notice any water or
13 anything around her?
14 A. Yes.
15 Q. Okay. Do you know -- was it, in fact, water, or
16 was it some other liquid? Do you know?
17 A I didn't pay a lot of attention, but the floor
18 was -- there was -- it was a little bit wet. I mean,
19 there was water there.
20 Q Okay. Do you know how the water got there?
21 A. No, I don't.
22 Q. Okay. Are you aware of any pallets of flowers
23 that had been in that area prior to this accident
24 happening?
25 A. Yes.

Page 20

1 Q. Okay. Can you tell me a little bit about that,
2 how many pallets and what did they have on them?
3 A. I don't remember exactly how many pallets, but
4 there was about two or three or -- I can't recall
5 exactly. And there was only buckets with flowers.
6 Q Okay.
7 A. But at that time I had already removed some of
8 the pallets from the area.
9 Q. Okay. Can you draw a little square where these
10 pallets were?
11 A. They were -- well, I had some in this area too.
12 Q. Okay. Go ahead and draw a square to signify
13 that a pallet was there.
14 A. There was -- and then there was more over here.
15 Q. Okay. So the pallets were on the floor area,
16 right?
17 A. Uh-huh.
18 Q. How did the pallets get there to the floor area?
19 A. A night before, my cooler went -- we had a
20 freezer problem, so all the flowers were removed from
21 the show case and they were placed, apparently, in one
22 of these coolers.
23 Q. Okay. What was the purpose of that, to keep
24 them alive?
25 A. Keep them alive.

Page 21

1 Q. Fresh and so forth?
2 A. Keep them fresh, correct.
3 Q. Okay. So how -- who actually put the pallets
4 there or why did it come that they came to be in the
5 aisleway?
6 A. Apparently, when they -- I'm not sure, though.
7 When -- in the morning when the workers go in, sometimes
8 if there is pallets in the middle of the cooler, they're
9 in the way. So what they tend to do or what they do,
10 they just move those pallets out of the way so they can
11 continue working on what they're doing.
12 Q. Okay. When you say "they," are you referring to
13 Hill Floral employees?
14 A. No.
15 Q. Sam's employees?
16 A. Correct.
17 Q. Okay. And do you know for sure that's, in fact,
18 what happened?
19 A. No, I'm not for sure.
20 Q. Okay. Did you physically put the pallets there
21 in the aisle?
22 A. No.
23 Q. All right Did -- at that time did you have
24 another employee working with you?
25 A. No.

### Page 22

1  Q. So it was just you by yourself?
2  A. Correct.
3  Q. Did you instruct, did you tell anybody to have
4  those pallets placed in the aisles?
5  A. No.
6  Q. Did anybody tell you that your pallets were --
7  well, first of all, let me make sure I have this
8  straight. Were these your pallets, these three that
9  you've drawn little squares on?
10  A. Yes.
11  Q They were your pallets with floral merchandise
12  on them; is that right?
13  A. Yes.
14  Q. Okay. Did anybody tell you, any Sam's employees
15  or anybody, tell you that they were taking your pallets
16  out of the freezers or coolers and moving them out of
17  the way so they could do their own work?
18  A. Yes.
19  Q What did they tell you and who told you?
20  A. Jose --
21  Q. I'm sorry. Let me just ask one question at a
22  time. Who told you that?
23  A. Jose Francisco --
24  Q. Okay.
25  A. -- mentioned it to me, "I have your flowers by

### Page 23

1  the freezer cooler. Go get them."
2  Q. Okay. Was that first thing in the morning?
3  A. Yes.
4  Q Before customers or members started to come in
5  the store?
6  A. No, there were already customers in the store.
7  Q. Okay. And after Jose told you that, what was
8  your response?
9  A. I went and started bringing all my flowers to
10  the floral department area.
11  Q. Okay. Were you still having a problem with your
12  freezer or your cooler or whatever it was in your
13  department? .
14  A. No, it was already taken care of.
15  Q. Okay. How did you go about moving everything to
16  your department?
17  A. I worked with the pallet jack.
18  Q. Okay.
19  A. And I used the pallet jack to remove the pallets
20  over to the area that I need to transfer those flowers.
21  Q Did anybody help you in that endeavor?
22  A. No.
23  Q. You did that all by yourself?
24  A. Yes.
25  Q. All right And so you moved three pallets over

### Page 24

1  to your area?
2  A. Yes, I -- there was -- I'm not sure exactly how
3  many pallets, but I removed everything that they had
4  pulled from the showcase over to the showcase again.
5  Q. Okay. Now, you said there were some flowers in
6  buckets; is that --
7  A. Yes.
8  Q. Is that correct?
9  A. Correct.
10  Q. A bucket, like just a plastic pail, or was it a
11  vase of some sort?
12  A. No, it's a bucket. It's a round bucket, tall
13  bucket.
14  Q. And do the buckets have anything in them besides
15  the flowers?
16  A. Water.
17  Q. Water? All right. And was there water in these
18  buckets as you were moving the pallets over to your
19  area?
20  A. Yes.
21  Q. Are you aware of any water spilling onto the
22  floor from these buckets?
23  A. No.
24  Q. You never saw any water?
25  A. No.

### Page 25

1  Q. Okay. Did anybody ever tell you, "Hey, Beni,
2  there is some water over here that fell out of your
3  buckets" or anything like that?
4  A. No.
5  Q. Okay Did maintenance ever come by or somebody
6  with Sam's ever come by and tell you to clean up some
7  water or anything like that?
8  A. No.
9  Q. So until the time that you happened to be
10  walking by and saw Ms. Garza on the ground, that was the
11  first time you were aware of water that had been spilled
12  on the floor; is that correct?
13  A. I'm trying to recall the accident, but I think
14  yes.
15  Q. You think that's the first time you saw anything
16  spilled on the floor was when you came over there and
17  saw her on the ground?
18  A. The only thing is I remember her, seeing her on
19  the floor. That's when I saw the water.
20  Q. Okay. So you didn't see the water before that
21  then, right? You weren't aware of maintenance coming to
22  clean up that water or anything like that prior to her
23  falling?
24  A. It's been some time back that I'm trying to
25  remember.

Page 26

1  Q. I know that, and I apologize.
2  A. I'm not sure.
3  Q. Okay. What was wrong with -- can I borrow that
4  pen, please? What was the problem with the cooler in
5  your department the night before?
6  A. One of the thermometers had given up or it got
7  frozen, and that's when it create the problem of not
8  cooling.
9  Q. Were you aware of any water leaking --
10 A. No.
11 Q. -- from that cooler?
12 A. No.
13 Q. Okay. In the few -- you'd only been working
14 there about three or four days or so when this accident
15 happened. Were you aware of any leaks or anything in
16 that area that was generating water on the floor that
17 was a water source causing water to be there that wasn't
18 supposed to?
19 A. Are you talking about my area or --
20 Q No.
21 A. My floor area, or are you talking about the
22 freezer?
23 Q. I'm talking about the freezer area. Were you
24 aware of any freezers or coolers or anything leaking
25 water in the few days prior to the accident? Because

Page 27

1  you'd only been working there a few days.
2  A. Well, I remember just seeing water like coming
3  from the doors. And they were kind of spilling a little
4  bit of water down, but not a lot a lot of water.
5  Q. Okay. Sometimes when it gets real cold the
6  doors get condensation on them, or if somebody leaves it
7  open too long, you know, maybe -- is that the kind of
8  water you're talking about?
9  A. That's the kind of water I'm talking about,
10 correct.
11 Q. Okay. So just condensation from the doors is
12 the only water you saw, but nothing else really?
13 A. No.
14 Q. Okay. You weren't aware of any leaks from the
15 roof or --
16 A. No.
17 Q. -- anything like that? If -- if you are to
18 see -- if you see water, say, today or -- yeah, today,
19 if you see water in that area, in the freezer cooler
20 area, whose responsibility is it to clean it up, you --
21 yours or somebody with Sam's?
22 A. It will be my responsibility.
23 Q. Even if it's in the freezer cooler area?
24 A. Yes.
25 Q. Okay. Why is that?

Page 28

1  A. Well, because we're responsible for any -- I
2  mean, anything that is -- any -- how can I say this? If
3  I see it, I'm going to clean it up. I'm not going to
4  wait for the next person to do it for me. I'm not going
5  to leave it there just because it's not my department.
6  Q. Okay. And, obviously, you don't go around with
7  a mop, you know, looking for water?
8  A. No.
9  Q. So what would you -- what would you do? How
10 would you go about cleaning it up?
11 A. We have some paper -- I mean, rolls, like
12 napkins.
13 Q. Uh-huh.
14 A. That we carry those with -- I mean, those are
15 very handy.
16 Q. Okay.
17 A. And if we see something, we just use the napkins
18 for it.
19 Q. Okay. After Ms. Garza fell and you were there
20 and you had asked her if she was okay, did you stay
21 there until she left or did you follow her outside or --
22 A. No, I stayed there.
23 Q. -- what happened?
24 A. I stayed there until management came to the
25 scene.

Page 29

1  Q. Okay. Did you provide any statements to
2  management?
3  A. No.
4  Q. Okay. Nobody asked you, "Beni, what did you
5  see" or anything like that?
6  A. No.
7  Q. Did you volunteer any information about --
8  A. No.
9  Q. Okay. Those buckets that are on these pallets,
10 about how tall are they? If you'll just kind of -- I
11 mean, are they tiny or are they tall?
12 A They're -- they're not tiny and they're not
13 tall. They're just a medium size of a bucket.
14 Q. Can you use your hand maybe to show the
15 videographer maybe about how tall you think they are
16 from the floor to the -- from the table to --
17 A. Well, approximately, I would say about this
18 tall.
19 Q. Okay. And how much water is in them?
20 A. About this much.
21 Q. All right. When you're moving the buckets
22 around with the pallet jack, have you ever had occasion
23 where a little water spills out the side of the bucket,
24 anything like that?
25 A. No.

Page 30

1  Q. Never?
2  A. No, never.
3  Q You've never seen any water spill out of one of
4  your floral buckets?
5  A. No.
6  Q. Is it possible that the water that she fell in
7  that day came from one of these buckets?
8     MR. FISHER: Object to form.
9  Q From one of these pallets?
10    MR. FISHER: Object to form.
11 Q. Go ahead and answer. Is it possible that the
12 water that was in the aisle that she fell on came from
13 one of these buckets that was on one of these pallets
14 that was moved?
15    MR. FISHER: Object to form, and you can go
16 ahead and answer the question.
17 A. I'm not sure.
18    MR. GARCIA: Okay. I'll pass the witness.
19          EXAMINATION
20 BY MR. DRABEK:
21 Q. Hi, Beni.
22 A. Hello.
23 Q. I'm Jaime Drabek. I'm Sam's attorney, okay?
24 A. Okay.
25 Q. A couple of quick questions for you. One, how

Page 31

1  old are you?
2  A. 33.
3  Q. 33. Did you happen to see this lady walking
4  around the store before she fell?
5  A. Yes.
6  Q. Okay. Did you note anything unusual about her
7  or something that struck you about her in any way?
8  A. Yes.
9  Q. What was that?
10 A. I guess her clothes.
11 Q. What was she wearing that was so noticeable for
12 you?
13 A. Shorts, very low shorts, and a T-shirt, but a
14 very provocative T-shirt.
15 Q. Okay. Was she with anybody?
16 A. Yes.
17 Q. Another woman?
18 A. Yes.
19 Q. Okay. Did you talk to her at all before she
20 fell?
21 A. No, I couldn't -- can you repeat the question?
22 Q. Sure. You saw her in the store, but you didn't
23 talk to her, right?
24 A. No.
25 Q. Okay. Did you have an impression of her just by

Page 32

1  looking at her?
2  A. Well, yes and no. By the way she was dressed,
3  it was kind of --
4  Q. Okay. Did you have an impression that she was
5  going to be trouble?
6  A. Yes.
7  Q. Okay. I would imagine, Beni, that Hill Floral
8  does have some sort of written materials about your
9  duties and responsibilities, right?
10 A. That's correct.
11 Q. Do you keep those at the store with you?
12 A. Yes.
13 Q. Okay. And from time to time do you get
14 communications from your district manager about all the
15 things you need to look out for, do, or sell, or
16 merchandise, that kind of thing?
17 A. Correct.
18 Q. Okay. And how often does your district manager
19 come down to see you?
20 A. Sometimes once every three months, or she's
21 usually checking on us constantly.
22 Q. Okay. Thank you, Beni. That's all I have.
23 A. Thank you.
24    MR. FISHER: I'll reserve mine until the
25 time of trial.

Page 33

1          EXAMINATION
2  BY MR. GARCIA:
3  Q Just a couple of follow-up questions. You just
4  told Mr Drabek that your impression of her as you saw
5  her walking around the store was that she was going to
6  be trouble. What kind of trouble was she going to be?
7  A. It's very difficult for me to describe or say
8  what kind of trouble, but it's --
9  Q. Are you telling us and the jury that she was
10 going to be trouble just because of the clothes she was
11 wearing, the type of clothes she was wearing?
12 A. No.
13 Q. Okay.
14 A. No.
15 Q. Please try to explain. I mean, what is it that
16 made you think, "Hey, this lady is going to be trouble"?
17 Did she tell you something or did you overhear her tell
18 somebody else something that made you think, "Man, this
19 lady is trouble"?
20 A. No. It's -- well, I guess the minute I saw it,
21 I kind of -- I kind of figured it out like -- I didn't
22 figure it out. It kind of looked like, "Wow, she's
23 looking for trouble, maybe," but --
24 Q. The minute you saw her walking around?
25 A. Yes.

Page 34

1  Q. She's looking for trouble?
2  A. Yes.
3  Q. Based on the way she was dressed?
4  A. And the way she was actually walking and doing
5  things.
6  Q. What kind of things was she doing that you
7  observed that made you think the lady is trouble? What
8  kind of things was she doing? Was she doing anything
9  aside from just shopping?
10 A. No.
11 Q. Okay. Was she walking funny or something that
12 made you think she's trouble?
13 A. No.
14 Q. Okay. Ms. Martinez, thank you for your time.
15 That's all the questions I have.
16     MR. DRABEK: Thanks, Beni.
17     MR. FISHER: Thank you, ma'am.
18     THE WITNESS: You're welcome.
19     (Deposition concluded)

Page 35

1  ERRATA SHEET/SIGNATURE PAGE
2  PAGE LINE CHANGE           REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 I, BENEDICTA MARTINEZ, have read the foregoing
   deposition and hereby affix my signature that same is
15 true and correct, except as noted above.
16 _____BENEDICTA MARTINEZ_____
17 THE STATE OF TEXAS
18 COUNTY OF CAMERON
19 BEFORE ME, _____, on this day
   personally appeared BENEDICTA MARTINEZ, known to me or
20 proved to me to be the person whose name is subscribed
   to the foregoing instrument and acknowledged to me that
21 said witness executed the same for the purposes and
   consideration therein expressed.
22
   Given under my hand and seal of office this _____
23 day of _____, 2003.
24 _____
   Notary Public in and for the State of Texas
25

Page 36

1  THE UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF TEXAS
2       BROWNSVILLE DIVISION

3  ROSEANNA M. GARZA,        )(
        Plaintiff            )(
4                            )(
   VS.                       )( CIVIL ACTION NO. B-02-210
5                            )(
   SAM'S CLUB a/k/a WAL-MART )(
6  STORES, INC.,             )(
        Defendant            )(
7
8       REPORTER'S CERTIFICATE
9
       I, CORINNA N. GARCIA, Certified Court
10 Reporter, certify that the witness, BENEDICTA MARTINEZ,
   was duly sworn by me, and that the deposition is a true
11 and correct record of the testimony given by the witness
   on SEPTEMBER 18, 2003; that the deposition was reported
12 by me in stenograph and was subsequently transcribed
   under my supervision.
13     I FURTHER CERTIFY that I am not a
   relative, employee, attorney or counsel of any of the
14 parties, nor a relative or employee of such attorney or
   counsel, nor am I financially interested in the action.
15     WITNESS MY HAND on this the _____ day of
   _____, 2003.
16
17     _____
       CORINNA N. GARCIA, CSR NO. 5210
18     Expiration Date: 12/31/03
       Bryant & Stingley, Inc.
19     2010 East Harrison
       Harlingen, Texas 78550
20     (956) 428-0755